UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE R. KING,

     Plaintiff                      Civil Action No. 16-13196

v.                                 HON. TERRENCE G. BERG
                                 U.S. District Judge
                                 HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Diane R. King ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #19] be DENIED and that Plaintiff's Motion for Summary Judgment [Docket #11] be GRANTED to the extent that the case is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

On January 9, 2014, Plaintiff filed an application for DIB, alleging a disability onset date of August 31, 2013 (Tr. 123-124). After the initial denial of the claim, Plaintiff filed a request for an administrative hearing, held on June 10, 2015 in Detroit, Michigan before

Administrative Law Judge ("ALJ") Jan Leventer (Tr. 29).  Plaintiff, represented by Michael Cantor, testified, as did Vocational Expert ("VE") Stephanie Leach (Tr. 34-50, 50-57).  On July 2, 2015, ALJ Leventer found that Plaintiff was not disabled (Tr. 10-19).  On July 15, 2016, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review in this Court on September 6, 2016.

## BACKGROUND FACTS

Plaintiff, born October 20, 1954, was 60 when the ALJ issued her decision (Tr. 19, 123).  She received a GED in 1972 and worked previously as an office manager for a plumbing contractor (Tr. 154).  She alleges limitation as a result of hypertension, breathing problems/asthma, bladder control problems, arthritis, and sciatic nerve problems of the leg, arm, knees, and bottom.  She stopped working in August, 2013 because her employer retired and moved to Florida (Tr. 153).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She stood 5' 4" and weighed 230 pounds (Tr. 34-35).  In her former job as an office manager/secretary, she was not required to lift more than 20 pounds (Tr. 35).  The job was performed in both a sitting and standing position (Tr. 35).

Plaintiff did not experience medication side effects (Tr. 36).  She could lift an eight-pound item with the use of both hands (Tr. 37).  She was unable to sit or stand comfortably for more than five minutes (Tr. 37-38).  She experienced difficulty walking for even half a block (Tr. 39).  In addition to the exertional limitations, Plaintiff experienced hand numbness (Tr. 30).  She collected unemployment insurance between the time her employer closed the company in August, 2013 and December, 2013 (Tr. 41-42).  She stopped looking for work in November, 2014 due to her need to care for her husband (Tr. 41).  She admitted that she

had applied for approximately 10 to 15 jobs since November, 2014 (Tr. 44).  She reported that if she had found a job, she would have taken it (Tr. 46).

In response to questioning by her attorney, Plaintiff reported that her most recent employer was her brother and her employer before that was her father (Tr. 47-48).  Her computer activity at the jobs was limited to keeping track of expenses , creating invoices, and printing up contracts (Tr. 28).  She did not know how to use Microsoft Word or Excel (Tr. 48).

Plaintiff's pain was concentrated in her lower back, hips, and knees (Tr. 49).  She was unable to kneel and had to "belly crawl" up stairs (Tr. 49).  She required the use of a cane for walking (Tr. 50).  She did not require the use of both hands while using the cane (Tr. 50).

### B.    Medical Evidence[1]

### 1.    Treating Sources

March, 2006 imaging studies of the knees show moderately severe joint space narrowing in both knees as a result of degenerative joint disease (Tr. 238).  In May, 2013, Jairaj D. Mulchandani, M.D. noted Plaintiff's report of increasing back and knee pain and intermittent dizziness (Tr. 241).  She admitted to smoking daily (Tr. 241).  She reported that she would be "looking for a job soon" (Tr. 241).  He diagnosed her with Chronic Obstructive Pulmonary Disease ("COPD"), alcoholism, polyarthritis, and cardiomyopathy (Tr. 242).  May, 2013 imaging studies of the pelvis were positive for advanced osteoarthrosis of the right hip (Tr. 219).  Imaging studies of the lumbar spine showed diffuse "mild to advance[d] spondylosis" and diffuse and "very advanced facetal arthrosis" (Tr. 219, 250).  A chest x-ray was positive for diffuse mild thoracic spondylosis (Tr. 219).  Imaging studies of the bilateral

---

[1]Conditions significantly predating the alleged onset of disability date of August 31, 2013, while reviewed, are omitted from the present discussion.

knees showed advanced osteoarthrosis and osteocartilaginous loose bodies (Tr. 220-221, 251). A June, 2013 echocardiogram was normal except for mild left ventricular hypertrophy (Tr. 222, 252).

Dr. Mulchandani's notes from the same month state that Plaintiff was worried about her husband's possible "occult malignancy" (Tr. 253). Dr. Mulchandani found that the COPD was "clinically stable" (Tr. 253). His treating notes from the next month note Plaintiff's report that she was "feeling fine" other than joint pain but as a result of back and knee pain, was "[u]nable to do much" (Tr. 255). August, 2013 records note that she was "feeling fine" but was under stress taking care of her spouse (Tr. 257). She reported continued joint pain and shortness of breath (Tr. 257). In October, 2014, Plaintiff requested a refill of pain medication but reported "feeling fine" (Tr. 259). She reported financial, personal, and emotional problems and due to joint pain, was "[u]nable to do much around the house" (Tr. 259). She was prescribed Vicodin "as needed" (Tr. 260). The following month she reported severe right arm and neck pain as well as the "usual symptoms" of shortness of breath and back and joint pain (Tr. 261). She denied urinary problems (Tr. 261). She declined recommendations for x-rays and an EMG due to "insurance and financial problems" (Tr. 262). In December, 2013, Plaintiff reported that she was "unable to do much around the house" and experienced stress as a result of taking care of her husband (Tr. 263).

In June, 2014, Plaintiff, now reinsured, reported severe knee and back pain (Tr. 265). A bone scan from the same month showed oteopenia of the neck (Tr. 271). An x-ray of the hips and spine showed "very severe" osteoarthrosis of the right hip and mild to moderate osteoarthrosis of the sacrolumbar spine (Tr. 272). In August, 2014, Dr. Mulchandani performed a Depo-Medrol injection to the right knee (Tr. 279). Imaging studies of the knees from the following month show moderately severe degenerative joint disease in both knees

(Tr. 281).  In November, 2014, Plaintiff reported that she experienced increasing left knee pain and was unable to climb stairs (Tr. 282).  Dr. Mulchandani injected Plaintiff's left knee with Depo-Medrol (Tr. 283).  The following month, Plaintiff reported "much improved" joint pain and an improvement in the knee condition (Tr. 284).  In February, 2015, Plaintiff reported "intractable pain" of the lower back and knees (Tr. 288).

### 2.  Non-Treating Sources

 In February, 2014, Michael Geoghegan, D.O. performed a consultative examination on behalf of the SSA, noting Plaintiff's reports of arm and leg numbness, urinary incontinence, asthma,  hypertension, and knee and lumbar spine pain (Tr. 230).  Plaintiff reported difficulty walking one city block (Tr. 230). Plaintiff denied problems driving but noted that she needed to lean on a cart while grocery shopping (Tr. 230-231).  She reported that she could sit or stand for up to 30 minutes at a time and could carry a gallon milk in one hand for short distances (Tr. 230-231).

Dr. Geoghegan observed a moderate right limp and that Plaintiff used a cane (Tr. 231).  The lungs were clear (Tr. 231).  Plaintiff demonstrated 4/5 strength in the lower extremities and grip strength  and a limited range of spine motion (Tr. 232).  She exhibited moderate difficulty getting on and off the examination table and severe difficulty heel and toe walking, squatting, and hopping (Tr. 232).  He recommended abstaining from tobacco use and the use of physical therapy for chronic pain of the knees and lumbar spine (Tr. 234).

In March, 2014, Twaide Langham, D.O. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff could lift or carry up to 10 pounds; stand or walk for two hours and sit for six in an eight-hour workday; and push or pull without limitation (Tr. 64).  He found that Plaintiff was limited to occasional stooping, kneeling, crouching, crawling, and climbing of stairs and ramps (Tr. 64-65).  He

found no other limitations (Tr. 65). He noted that Plaintiff took care of her personal needs, cooked, handled her own finances, played computer games, walked for up to 20 minutes, and cared for her dog and her husband (Tr. 65). He concluded that Plaintiff could perform her past relevant work as actually performed (Tr. 67).

### C.    Vocational Expert Testimony

VE Leach classified Plaintiff's previous work as a officer manager as semiskilled and exertionally light[2] (Tr. 201). The ALJ then posed the following question to the VE, describing an individual of Plaintiff's age, educational level, and work experience:

> [A]ssume this individual is limited to less than the full range of sedentary exertion level work. She is limited to [the] sedentary exertional level and has the following additional limitations: She can occasionally climb ramps and stairs. She can never climb ladders, ropes and scaffolds. She can occasionally stoop, kneel and crouch. She can never crawl. She can never work [at] unprotected heights. She can occasionally work with moving mechanical parts, and she can occasionally be exposed to dust, odors, fumes and pulmonary irritants. Can such an individual perform the past relevant work? (Tr. 52).

The VE replied that the above-described individual would be unable to perform Plaintiff's past relevant work, but that Plaintiff's "limited computer skills" were transferrable to the sedentary, semiskilled jobs of "bookkeeping-type-clerk" (150,000 jobs in the national economy); payroll clerk (100,000); and general office clerk (200,000) (Tr. 53). She stated that the need to be off task for 20 percent of the work day (aside from customary break times) would preclude all work (Tr. 54). The VE stated that her testimony was consistent with the

---

2

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

information found in the *Dictionary of Occupational Titles* ("*DOT*") and *Selected Characteristics of Occupation* (Tr. 54).

In response to questioning by Plaintiff's attorney, the VE stated that Plaintiff's computer skills were "highly marketable" (Tr. 55). She testified that the fact Plaintiff was working in a family business and the "single industry" of plumbing would not affect the transferability of skills to other positions (Tr. 55). She stated that if Plaintiff's testimony that she required the use of a cane while standing were credited, none of the above-cited positions would be available (Tr. 57).

### D. The ALJ's Decision

Citing the medical records, the ALJ determined that Plaintiff experienced the severe impairments of "degenerative joint disease of the bilateral knees; osteoarthritis; degenerative disc disease; hypertension; obesity; and asthma/COPD" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 12-13).

He found that Plaintiff retained the residual functional capacity ("RFC") for sedentary work with the following additional limitations:

> [C]an only occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds or perform work at unprotected heights. The claimant can occasionally stoop, kneel, and crouch, but never crawl. The claimant can occasionally work with moving mechanical parts, and should have no more than occasional exposure to dusts, odors, fumes, and other pulmonary irritants (Tr. 13).

Citing the VE's job findings, the ALJ found that although Plaintiff was unable to perform her past relevant work, she had the transferrable skills to perform the jobs of bookkeeper, payroll clerk, and general office clerk (Tr. 18, 53).

The ALJ discounted the allegations of disability.  She cited Dr. Mulchandani's May, 2013 treating records stating that despite Plaintiff's complaints of fatigue, shortness of breath, and back and knee pain, she was in the process of looking for a new job (Tr. 14).  She cited Plaintiff's July, 2013 report that she was "overall feeling fine" and denial of urinary problems or dizziness (Tr. 14).  The ALJ noted that as of February, 2014, Plaintiff was able to dress, bathe, drive, shop, sit or stand for 30 minutes, bend over, and lift a gallon of milk with one hand (Tr. 15).  She observed that none of the treating sources endorsed the use of a cane (Tr. 17).  The ALJ noted Plaintiff was non-compliant with Dr. Mulchandani's recommendations for physical therapy (even after the reinstatement of medical insurance), the use of a knee brace, and smoking cessation (Tr. 17).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The ALJ's Credibility Determination

Plaintiff argues first that the ALJ's credibility determination was based on an erroneous interpretation of the record. *Plaintiff's Brief,* 4-9.

### 1.  Basic Principles

The credibility determination, currently guided by SSR 96-7p, describes the process

for evaluating symptoms.[3] As a threshold matter, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment ... that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (July 2, 1996). The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."[4] *Id.* However, a claimant's allegations of such limitations, standing alone, are generally insufficient to counter the ALJ's conclusion that her claims were not credible. While "an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" the

_____

[3]

In March, 2016, SSR 16-3p superceded SSR 96-7p. The newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." See 20 C.F.R. § 404.1529(c)(3), fn 7, *below*. Nonetheless, SSR 96-7p applies to the present determination, decided on August 20, 2015. See *Combs v. CSS*, 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

[4]

In addition to an analysis of the medical evidence, 20 C.F.R. § 404.1529(c)(3) lists the factors to be considered in making a credibility determination: "(i) . . . daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

credibility findings "must also be supported by substantial evidence." *Cruse v. CSS,* 502 F.3d 532, 542 (6th Cir. 2007)(*citing Walters v. CSS*, 127 F.3d 525, 531 (6th Cir.1997)).

## 2. The ALJ's Rationale for the Credibility Determination

The ALJ provided the following explanation for her determination that Plaintiff was not fully credible:

> [T]he undersigned notes that the . . . knee disorder, although severe, has remained essentially stable dating back to . . . 2006. Furthermore, she consistently denied any trauma, falls, or significant increase in pain since she began treating with Dr. Mulchandani. She also reported adequate control with medication, and considerable improvement in swelling and stiffness following Depo-Medrol injections. [She] also advised Dr. Geoghegan that she retained the ability to sit and stand for 30 minutes each and bend over and lift a gallon of milk with either upper extremity without difficulty. She . . . acknowledged that her employment as an office manager ended due to the retirement of her former employer, rather than her inability to keep up with the demands of the work. [She] also reported, on numerous occasions, that she dedicated a significant portion of her time to assisting her husband. . . . [S]he is purportedly responsible for a majority of household activities including meal preparation, cleaning, grocery shopping, running errands, medication management, and handling the household finances (Tr. 16-17).

The ALJ also noted "no opinion evidence" supporting Plaintiff's purported need for a cane (Tr. 17). She noted further that Plaintiff "ignored" the treating recommendation to quit smoking, use a knee brace, and attend physical therapy (Tr. 17).

## 3. Substantial Evidence Does Not Support the Finding That Plaintiff's Condition Was Unchanged since 2006

First, Plaintiff faults the finding that her knee condition was "essentially stable" since 2006. *Plaintiff's Brief* at 5 (*citing* Tr. 16). She notes that while the 2006 studies showed "moderately severe degenerative joint disease," the condition had progressed from "moderately severe" to "advanced osteoarthrosis" with osteocartilaginous loose bodies as of May, 2013 (Tr. 238, 251). I agree that the ALJ's finding that the imaging studies showed an "essentially stable" condition between 2006 and 2013 is not supported by the record.

On a related note, Plaintiff disputes the finding that she did not experience a significant increase in pain since beginning treatment with Dr. Mulchandani in May, 2013. *Plaintiff's Brief* at 5. Consistent with this argument, the records from November, 2013 state that in addition to continued joint pain, she experienced severe right arm and neck pain (Tr. 261). In December, 2013, Plaintiff reported that the back and knee condition were "getting worse" (Tr. 263). Dr. Mulchandani noted that she was "jumping with pain" upon movement of the knees and hips (Tr. 263). Upon seeking treatment after her insurance was reinstated in June, 2014, she reported that her joint pains were "getting worse" (Tr. 265). While the ALJ noted that Plaintiff experienced temporary relief from Depo-Medrol injections (Tr. 279, 283), later records noting "intractable pain" show that the improvement was temporary (Tr. 288).

While Plaintiff told Dr. Geoghegan that she could sit or stand up to 30 minutes, the assessment notes do not indicate whether she could do so on more than a rare basis (Tr. 230). Her statement that she could stand for up to 30 minutes is accompanied by her report that she needed to lean against the cart while shopping for groceries[5] (Tr. 230). Accordingly, I agree with Plaintiff that the ALJ's finding that the back and knee conditions remained stable between May, 2013 and May, 2015 is not supported by the treating records.

Plaintiff objects to other findings regarding the treating records. Admittedly, the ALJ's multiple citations to Plaintiff's report to Dr. Mulchandani that she was "feeling fine" does not amount to a literal misstatement of the record (Tr. 14-15). However, in most cases,

---

[5]

Further, the ALJ's finding that Plaintiff reported that she could lift a gallon of milk "without difficulty" represents a mischaracterization of the record. According to Dr. Geoghegan's report, she stated that she could lift a gallon of milk a "short distance" such as the distance between "the refrigerator and the table" (Tr. 230-231).

"feeling fine" was followed with a description of worsening back and knee pain (Tr. 255, 257, 259, 286). For example, the July, 2013 "feeling fine" was following by "other than joint pains" and that she was "[u]nable to do much" due to the back and knee conditions (Tr. 255). The August, October, and December, 2013 and January and April, 2015 records also show that in most of the records, "feeling fine" was directly followed by reports of worsening joint pain (Tr. 257, 259, 263, 286, 290). More obviously, Plaintiff did not seek medical treatment up to once a month over the course of two years because she was "feeling fine." I agree with Plaintiff that her multiple statements that she was "feeling fine" do not reflect the actual import of the treating records or support the finding that her claims were not credible.

### 4. The Daily Activities

Further, although an ALJ is entitled to support the credibility determination by citing a claimant's daily activities, *see* § 404.1529(c)(3)(1), *see* fn 4, *above,* the summation of the regular activities must accurately reflect the record. Here, the ALJ noted that Plaintiff could prepare meals, clean, grocery shop, run errands, manage her husband's medication, and handle their finances (Tr. 17). However, by Plaintiff's account, she grocery shopped only once or twice a week; did only three loads of wash each week; and sat "a lot" while cooking (Tr. 161-162). Even taking into account the relatively wide range of reported activities, the household chores and errands, interspersed with frequent rests and position changes, cannot be equated with the ability to work full time. *See Parks v. CSS,* 2014 WL 1305033, *10 (E.D.Mich.March 31, 2014)(claimant's ability to "talk to her friends, take care of the family pets, drive, and perform household chores ... for short periods followed by a break" failed to show non-disability)(*citing Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir.1967)(the ability to drive, grocery shop, wash dishes and sweep floor on an intermittent basis does not equate with the "ability to engage in substantial gainful activity"). In this case, Plaintiff's occasional

errands, limited household chores, and care for her disabled (and later, terminally ill) husband in spite of her own serious health conditions does not support the non-disability finding. *See also O'Neal v. Commissioner of Social Sec.,* 2013 WL 4550430, at *7 (E.D.Mich. August 28, 2013)(ALJ's finding that the claimant "was not disabled because he continued to do laundry, light cooking, shopping and housework amounts to a distortion of [his]testimony that he performed these activities between rest periods and even then, slowly and with difficulty")(internal citations omitted).

### 5. The Use of a Cane

The ALJ also observed that Dr. Mulchandani did not endorse Plaintiff's full-time cane use[6] (Tr. 17). The ALJ also found that Plaintiff "ignored" the treating physician's recommendation for a knee brace and "refused" to attend physical therapy (Tr. 17). However, these observations reflect a myopic reading of the record. First, as to the cane use, the record as a whole overwhelmingly supports the need for an assistive device. The x-rays from May, 2013 forward show advanced osteoarthrosis of the right hip, lumbar spine, and bilateral knees (219-220-221). Dr. Geoghegan's consultative examination records show "a moderate right limp" and "severe difficulty" heel and toe walking (Tr. 232). Further, Plaintiff did not require a prescription or even an "endorsement" by a treating source to establish that she needed a cane. Because the VE testified that the need to use a cane while standing would significantly reduce the positions available using transferrable skills, Plaintiff's cane use is critical to the non-disability determination (Tr. 56-57).

---

[6]While the ALJ actually found that "none of the treating sources" endorsed the use of a cane, the only treating source in the file is Dr. Mulchandani (Tr. 17).

Further, despite the ALJ's finding that Plaintiff "ignored" Dr. Mulchandani's remark that she "may use a knee brace," this treating physician's acknowledgment that Plaintiff required a medical device to address the joint problems supports rather than detracts from Plaintiff's claim that she required a cane (Tr. 282). While the ALJ states that Plaintiff "ignored" the recommendation for a knee brace and "refused" the recommendation for physical therapy, the records from that date state that Plaintiff was "[u]nder [a] lot of stress taking care of the sick spouse at home" and declined the recommendation for therapy "because of personal and family problems" (Tr. 282). Given the totality of circumstances, Plaintiff's "failure" to acquire a knee brace and sign up for a course of physical therapy during the time she acted as her husband's terminally ill primary care giver does not undermine the disability claim.

### 6. Plaintiff's Work Activity

The ALJ also noted that Plaintiff ended her employment due to her employer's retirement rather than disability (Tr. 14, 17, 41-42). The observation that she stopped working due to job termination rather than disability and attempted to find other work for the following year can generally be used to support a non-disability finding. "There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.' " *Workman v. CSS.*, 105 Fed.Appx. 794, 801–02, 2004 WL 1745782, *7 (6th Cir. July 29, 2004)(*citing Bowden v. CSS*, 1999 WL 98378, at *7 (6th Cir. Jan.29, 1999)). However, the credibility determination once again founders on the ALJ's failure to consider the context of Plaintiff's attempts to find other work. Before discounting a disability claim on the basis that the claimant collected unemployment records on the premise that she is looking for work, the ALJ must consider the entirety of circumstances

surrounding the application for benefits. *Smith v. Astrue*, 2011 WL 3897752, *5 (E.D. Mich. July 6, 2011); *Webster v. Colvin*, 2014 WL 4095341, *9 (E.D.Tenn. August 19, 2014). An August 2010 memorandum by the Chief ALJ for the Social Security Administration instructs ALJs that "the receipt of unemployment benefits [and corresponding search for other work] does not preclude the receipt of Social Security disability benefits" and "is only one of many factors that must be considered in determining whether the claimant is disabled." The Chief ALJ noted that "because the disability decisionmaking process is uncertain and quite lengthy, a claimant should not be forced to choose between applying for unemployment and disability benefits." *Id.* Although the ALJ did not directly discount Plaintiff's claims based on her receipt of unemployment benefits, he noted that she continued to search for work for over a year after the onset of disability date. The ALJ's rejection of Plaintiff's claims on the basis of her unsuccessful efforts to procure work is of concern, particularly because the records shows that her effort to obtain work was attributable to significant financial limitations (Tr. 46, 259).

Moreover, while the credibility analysis relies heavily on Plaintiff's ability to work until she lost her job due to her employer's retirement in August 31, 2013, the record is undeveloped as to the exertional requirements of the former position or whether the job included "accommodations." While Plaintiff admitted that she stopped working for reasons unrelated to her disability, the treating records and imaging studies created in the months preceding her termination, along with her testimony, cast doubt on whether she was actually capable of performing the office manager job at either the light or sedentary exertional level. Significantly, Plaintiff's application for benefits omits a description of either the exertional or postural requirements of her former job (Tr. 155). Her hearing testimony that she was unable to stand or sit *comfortably* for more than five minutes or walk for more than half a

block, along with the objective evidence, stands at odds with the finding that she was capable of sedentary work (Tr. 37-39). The fact that Plaintiff worked for her brother (along with the evidence and testimony suggesting that she was incapable of even sedentary full-time work) requires inquiry into whether the job activity was "accommodated" work rather than substantial gainful activity required to show "past relevant work." *See* 20 C.F.R. § 404.1573(c) ("[i]f your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity"). The factors to be considered in whether the claimant performed accommodated or "sheltered work" consist of the following:

> (1) You required and received special assistance from other employees in performing your work; (2) You were allowed to work irregular hours or take frequent rest periods; (3) You were provided with special equipment or were assigned work especially suited to your impairment; (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work; (5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or (6) You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare. § 404.1573(c).

While the record is silent as to factors one through five, Plaintiff testified that her employer was her brother[7] (Tr. 47-48). At a minimum, she meets one of the criteria for accommodated work. Her application for benefits states that she worked in that position between 2003 and 2013, and before that, held the same position working for her father for the previous 31 years (Tr. 47-48, 154). Despite the fact that the imaging studies, Plaintiff's testimony, and the treating and consultative observations support the finding that she was

---

[7]However, Plaintiff's counsel appears to argue that the work was accommodated, noting at the hearing that Plaintiff worked in "a family business" in which she was "not . . . competing with an open market" (Tr. 55).

incapable of even sedentary work, the record is wholly undeveloped as whether her work for her brother constituted accommodated work. The ALJ's finding that Plaintiff's job skills culled in the course of the past relevant work were transferrable to other positions assumes that the former work constituted Substantial Gainful Activity. Conversely, a finding that the former job activity was in fact "accommodated" work would invalidate the finding that she had "transferrable" skills. As such, a remand is also warranted for development of whether Plaintiff's former work activity was accommodated work.

Notwithstanding the deference customarily accorded an ALJ's credibility determination, the above-discussed errors require a remand for further fact-finding. *Cruse, supra,* 502 F.3d at 542,

## B. The VE's Job Findings

Plaintiff also argues that the ALJ erred by finding that Plaintiff's skills as the office manager of her family's plumbing business were transferrable to the positions of bookkeeper, payroll clerk, or office clerk. *Plaintiff's Brief* at 9-11. She cites 20 C.F.R. § 404.1568(d)(4) which states that for claimants of "advanced age [55-60]" with "severe impairment(s)" that limit them to sedentary work, "we will find . . . skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to [the] previous work that [one] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."

In response, Defendant contends that the ALJ actually cited the applicable standard by finding that there would be "very little, if any" vocational adjustment. *Defendant's Brief, 23, Docket #19,* Pg ID 377 (*citing* Tr. 18). Defendant notes further that Plaintiff stipulated to the VE's qualifications as an expert and her application of "regulatory rubric of transferability." *Id.* at 24. Thus, Defendant argues that the ALJ's reliance on the VE's job

findings was proper. *Id.* at 24. Defendant notes further that "skills that are 'clerical' or 'administrative' have 'universal applicability across industry lines,'" and thus "'transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any vocational adjustment.'" *Id.* at 25 (*citing* SSR 82-41, 1982 WL 31389, *6 (1982)).

In discussing the positions of bookkeeper, payroll clerk, or office clerk, the VE did not state explicitly that the transferrable positions would require "very little, if any vocational adjustment" (Tr. 56). Rather, she stated, "I don't think there'd be a lot of vocational adjustment" (Tr. 56). However, Plaintiff does not provide a basis for his argument that the jobs cited by the VE would require more than "very little" vocational adjustment. Plaintiff's argument that the VE's job findings do not comport with the DOT job titles is not well taken. For example, while she argues that the DOT listing provided by the VE for the job "bookkeeper" corresponds to the position of "receptionist," a description of the position includes the possible job requirements of typing memos, correspondence, and reports and an additional "variety of clerical duties." DOT Code 237.367-038. Despite the discrepancy in job titles, Plaintiff has not shown that the listed position would require more than "very little" vocational adjustment.

Procedurally, then, it would appear that the VE's testimony was sound, and standing alone would not provide a basis for remand. However, that analysis might be impacted by the ALJ's reconsideration of Plaintiff's credibility. Upon remand, the ALJ might find a more restrictive RFC, or alternatively, that the former work activity was "accommodated work" rather than Substantial Gainful Activity. For instance, while Plaintiff testified that she could ascend stairs only by crawling (Tr. 49), the current RFC states that she could climb stairs on an occasional basis (up to one-third of the workday) (Tr. 52). A more restrictive

RFC/hypothetical question crediting Plaintiff's testimony would be likely to change the job findings. Until the errors discussed in Section A are resolved, the determination of whether Plaintiff possesses transferrable skills is not appropriate for further review.

For overlapping reasons, I decline to recommend a remand for an award of benefits. While a remand to the administrative level is warranted for the reasons set forth in Section A., a remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v.HHS,* 17 F.3d 171, 176 (6th Cir. 1994). In this case, a remand for benefits prior to the resolution of the unresolved factual issues would be premature. As such, I recommend a remand for further administrative proceedings consistent with the above analysis.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #19] be DENIED and that Plaintiff's Motion for Summary Judgment [Docket #11] be GRANTED to the extent that the case is remanded for further administrative proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: August 29, 2017                    s/R. Steven Whalen
                                          R. STEVEN WHALEN
                                          UNITED STATES MAGISTRATE JUDGE


---

**CERTIFICATE OF SERVICE**

**I hereby certify on August 29, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants August 29, 2017.**

                    **s/Carolyn M. Ciesla**
                    **Case Manager for the**
                    **Honorable R. Steven Whalen**